Rosa Molina de Manzanares, Petitioner and Appellant, v. Andrés Lugo, Warden of San Juan District Jail, Respondent and Appellee.

No. 3688.  Argued November 16, 1928.—Decided December 12, 1928.

M. Rodríguez Serra for the appellant.  José E. Figueras for the appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

Rosa Molina de Manzanares presented a petition in habeas corpus to the District Court of San Juan.  She alleged that she was imprisoned under a warrant issued by the district attorney on a charge of being an accomplice in the murder of her husband, Amador Manzanares.  She alleged that the district attorney refused to admit her to bail and prayed the court to inquire into the cause of her imprisonment and order her release with or without bail, "because the charge against her has no reasonable or probable cause which justifies her arrest and even less without admitting her to bail pending the trial of the case."

The district court issued the writ, investigated the cause of the imprisonment and decided, without in any manner prejudging the case on its merits, that it should deny the petition.

The petitioner appealed to this court and in her brief assigned five errors.

The first assignment is that the court erred in admitting in evidence a letter addressed to the district attorney by Dr. Martínez Alvarez.

We have examined the so-called letter and it is the professional report of the autopsy held on the dead body of Amador Manzanares. That report is addressed to the district attorney who ordered the autopsy and is signed by Dr. A. Martínez Alvarez, after whose signature the following appears:

"Sworn to and signed before me by Dr. A. Martínez Alvarez. (Signed) M. Romaní, District Attorney."

As may be seen, there is no error. The law does not require the document to be sworn to at the beginning. From the manner in which the oath was taken in this case it should be understood that the contents of the report were verified. The contention of the appellant that the doctor could not be prosecuted for perjury in case any of the essential facts of the report were shown to be false has no foundation. Even admitting that the oath appears to have been administered or taken irregularly, that would not be accepted as defense in a prosecution for perjury, according to the positive provision of section 117 of the Penal Code.

The other assignments may be reduced to one, i. e., that the evidence introduced by the district attorney does not show a crime of murder in the first degree, or that the presumption of the guilt of the appellant is great.

All of the evidence presented by the district attorney at the hearing on the petition in habeas corpus consisted of the doctor's report and the affidavit of one witness.

The report is too long to be transcribed. It is deduced therefrom that the autopsy held on the deceased Manzanares showed several contusions on his body in the cranial, thoracic and abdominal regions. It concludes as follows:

"Summary of the most serious lesions found in the course of this autopsy which by their nature, intensity and effects caused *the death.*

"(*a*) Intracranial hemorrhage by contusion in the right front parietal region.

"(*b*) Pleuritical hemorrhage by laceration of both lungs.

"(*c*) Intra-abdominal hemorrhage produced by the rupture of the spleen and right kindney.

"(*d*) Shock by loss of blood."

Therefore it is evident that the death of Manzanares supervened in consequence of the contusions which he received. How and by whom were these contusions inflicted? The other document submitted by the district attorney tends to demonstrate this. It reads as follows:

"Before the district attorney, Marcelino Romaní, appears Francisco Montañez who after being duly sworn according to law says:

"That his name is Francisco Montañez, 19 years old and a resident of San Juan; that on or about the night of the 26th of October, 1928, the deponent was a messenger of the Colón Pharmacy No. 1 on Monserrate street in Santurce of San Juan; that the said pharmacy was owned by Amador Manzanares who was married to Rosa Molina; that Rafael Figueroa had been a clerk in said pharmacy for about two and a half months; that this pharmacy was located in a two-story house and the second floor has a balcony about six meters above the street; that there is a concrete sidewalk under the balcony and the street is full of stone and gravel, the stones being of different sizes from two pounds down.

"That on the night of the 26th of October the deponent was sleeping on the ground floor of the house in which the pharmacy is located; that shortly after midnight he saw Amador Manzanares come down to the pharmacy, take some pepsin and immediately return to the upper floor where his wife was sleeping; that when he entered the room occupied by his wife, Rosa Molina, the deponent heard Amador Manzanares say, 'So, reprobates, that is what you do,' and immediately he heard frantic struggling; that then the deponent went out on the street so as to see what was going on upstairs; that the commotion continued for a long time and then the deponent saw that Amador Manzanares was being dragged by Rosa Molina, who held him by the feet, and Rafael Figueroa, who held him by the head; that Amador Manzanares was limp and more dead than alive and in that condition he was brought to the balcony of the house where Rosa Molina struck Amador Manzanares on the forehead with a large hammer, after which Rosa Molina and Rafael Figueroa threw

him off the balcony to the sidewalk and into the street where he struck against the pavement and the stones in the street and received many blows. .

"That after he was thrown into the street Rafael Figueroa ran and jumped from the balcony to the garage and from the garage to another small balcony on the first floor and thence down to the street; that the balcony from which Amador Manzanares was thrown was that of the second floor which, as I said before, is about six meters high; that Amador fell to the street almost dead and was taken from there to the San Juan municipal hospital where he died shortly after."

That is the case. In the exercise of the right of every citizen under the law, Rosa Molina asked for an investigation of the cause of her imprisonment. The district attorney said that he had ordered her imprisonment without bail because in his search for the causes of the violent death of Manzanares he had found sufficient evidence to justify the belief that it was a case of murder in the first degree and that Rosa Molina was one of its perpetrators. Therefore, it is not a question of the guilt or innocence of the appellant, but simply of deciding whether or not the district attorney was justified in ordering her imprisonment without bail.

Section 2 of the Organic Act of Porto Rico reads in part as follows:

"That all persons shall before conviction be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great."

This constitutional provision had been in force in Porto Rico since 1902 by virtue of sections 372 and 373 of the Code of Criminal Procedure, which read as follows:

"Sec. 372. A defendant charged with an offense punishable with death can not be admitted to bail when the proof of his guilt is evident or the presumption thereof great. The filing of an information does not add to the strength of the proof or the presumptions to be drawn therefrom.

"Sec. 373. If the charge is for any other offense he may be admitted to bail before conviction."

The law in force in the State of California is the same as that in Porto Rico. In *Flores* v. *People,* 30 P.R.R. 542, this court, after transcribing section 372 of the Code of Criminal Procedure, said:

"That statute is the same as section 1270 of the Penal Code of California. In that State the provision is also included in the Constitution. Article 1, Section 6. Such is also the case in Porto Rico. Organic Act, section 2, paragraph 4."

This being so, it seems logical to resort to the jurisprudence of California in order to construe that provision, as was done in the case of *Flores* v. *People, supra,* and lay down the rule to be followed after making the accusation.

That jurisprudence is as follows:

"The expressions, 'proof is evident,' or 'presumption great,' have received different interpretations by the courts of the various states, some courts holding that the prisoner is entitled to bail unless the evidence against him is such as ought to satisfy a trial jury of his guilt beyond a reasonable doubt; while others hold that bail should be denied where the evidence is sufficient in law to sustain a capital conviction. The latter rule has been adopted in this state. So, in a habeas corpus proceeding, the court ought not to anticipate the action of the jury by discharging the prisoner, charged with a capital offense, with or without bail, upon evidence which it cannot say is so insufficient that a verdict requiring a capital sentence should not be permitted to stand. It has been held that to sustain an order refusing to admit a prisoner charged with a capital offense to bail, it is not necessary that the evidence should be so convincing as to justify a verdict against the accused, but it is sufficient if it points to him and induces the belief that he may have committed the offense charged." 3 Cal. Jur. 1029–30.

After analyzing the evidence submitted by the district attorney in this case in the light of the law in force as construed by the Supreme Court of California we must conclude that the district court acted correctly in denying the petition of the appellant.

For the purposes of forming our opinion we should begin with the reliability of the testimony of witness Montañez. It

may be deficient in some particulars and susceptible of criticisms in others, but it must be recognized that it is compatible with the medical report and contains direct imputations against the appellant which, if believed by a jury, would justify them in finding a verdict of murder in the first degree.

"Murder is the unlawful killing of a human being, with malice aforethought." Section 199 of the Penal Code. "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Section 200 of the Penal Code. "All murder which is perpetrated by means of poison, lying in wait, torture, *or by any other kind of wilful, deliberated, and premeditated killing,* or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, *is murder in the first degree,* and all other kinds of murder are of the second degree." (Italics ours.) Section 201 of the Penal Code. "Every person guilty of murder in the first degree shall suffer death . . ." Section 202 of the Penal Code.

We know from the testimony of Montañez that on the night of the 26th of last October Manzanares went from the upper floor of the house in which he lived to his pharmacy on the ground floor to take some medicine; that he returned to the second floor and spoke certain words in the plural which were followed by a great commotion. The witness went into the street and from there saw that Amador Manzanares was being dragged by Rosa Molina, who held him by the feet, and Rafael Figueroa, who held his head; that Amador Manzanares was limp and more dead than alive and in that condition he was brought by them to the balcony.

What did the appellant do then? The witness says that she took a hammer and struck Amador Manzanares on his forehead.

And what more did she do? Montañez says that she and Rafael Figueroa threw Manzanares from the balcony to the sidewalk and into the street.

The balcony was that of the second floor of the house and Manzanares was taken from the street to die shortly afterwards as described by Dr. Martínez Alvarez in his autoptic report.

Therefore, it appears from that evidence that the appellant and another person unlawfully killed her husband wilfully, premeditatedly and deliberately. Although the word *"alevoso"* of the Spanish text is stronger than the English word "wilful," there is *alevosía* here, for when Rosa Molina struck Manzanares on the forehead with the hammer he was limp and more dead than alive. And what else save deliberation and premeditation in the perpetration of the killing is revealed by the act of dragging Manzanares to the balcony in that condition, striking him with the hammer and then throwing him from there into the street?

It has been held repeatedly in jurisprudence that no long time is required for finding the existence of premeditation and deliberation. What is necessary is that there should appear from the evidence the conscious, determined and persistent purpose of the author to inflict death although all should occur in one moment. And in the present case that conscious, determined and persistent act appears clearly from the evidence.

We have been compelled to express our opinion in order to decide the case submitted for our determination, but desire to repeat the statement made by the trial judge in setting forth the grounds of the decision appealed from. Our present opinion shall not in any way prejudge the case nor can it be invoked in any manner against the appellant. The testimony of Montañez may be corroborated or destroyed or explained differently at the trial. The truth may be other than that stated by Montañez. It is only on the evidence

introduced by both parties at the trial that the appellant can be finally judged.

The decision appealed from must be affirmed.

Mr. Justice Hutchison dissented.